APPEAL NO. 11-2959

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

MAYO FOUNDATION FOR MEDICAL EDUCATION & RESEARCH,
MAYO CLINIC, AND CERNER CORPORATION

PLAINTIFFS-APPELLEES,

vs.

PETER L. ELKIN, M.D.,

DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MINNESOTA

THE HONORABLE DAVID S. DOTY
UNITED STATES DISTRICT JUDGE, PRESIDING

**BRIEF OF APPELLANT**

December 29, 2011

David J. Massa
GALLOP, JOHNSON & NEUMAN, L.C.
101 South Hanley Road, Suite 1700
St. Louis, Missouri 63105
(314) 615-6000 / Fax  (314) 615-6001

Attorneys for Defendant-Appellant
Peter L. Elkin, M.D.

## SUMMARY OF THE CASE AND
## REQUEST FOR ORAL ARGUMENT

Dr. Peter Elkin is the primary inventor, in part under federal grants, of software applying "natural language processing" to medical text. His former employer, Mayo Foundation and Mayo Clinic ("Mayo"), sued to enjoin him from use or disclosure of the programs. Mayo had licensed some of the programs to Cerner Corporation ("Cerner").

Cerner obtained summary judgment on Elkin's counterclaim against it. A jury trial resulted in (1) a declaration of ownership by Mayo and an injunction against Elkin, and (2) a verdict for Elkin against Mayo for breach of contract, awarding royalties to Elkin. $1,900,139.30 in attorneys' fees were awarded to Mayo.

This appeal, based on a intricate and voluminous record, presents important issues concerning injunctive relief directed to disputed software rights, intellectual property law, attorneys' fees, and the exclusion of expert testimony tracing the origin and ownership of parts of several programs. Because of the number and complexity of the issues, Dr. Elkin requests oral argument of 30 minutes per side.

i

# TABLE OF CONTENTS

PAGE

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT i

TABLE OF AUTHORITIES .................................................................... iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................... 3

STATEMENT OF THE CASE ................................................................ 6

SUMMARY OF ARGUMENT ................................................................ 10

ARGUMENT ....................................................................................... 13

CERTIFICATE OF SERVICE............................................................... 58

ADDENDUM ....................................................................................... 59

Appellate Case: 11-2959    Page: 3    Date Filed: 12/30/2011 Entry ID: 3864389

# TABLE OF AUTHORITIES

CASES

*Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 844-45 (Fed. Cir. 1992)..........................................................................34, 35

*Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).................................7, 59

*Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188 (2011) 4, 13, 40, 41, 42, 43, 47

*Campbell v. Leaseway Customized Transport*, 484 N.W.2d 41, 44 (Minn. App. 1992).........................................................................................19

*Clearone Communications v Bowers*, No. 09-4092 (10th Cir. June 27, 2011) ..........................................................................................57

*Computer Associates Int., Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992) ............................................................................................3, 32

*Consolidated Beef v. New York Life Ins.*, 949 F.2d 960, 966 (8th Cir. 1991) ..............................................................................................28

*Data Gen. Corp. v. Grumman Sys. Support*, 825 F. Supp. 340, 355 (D. Mass. 1993).................................................................................34

*Dataphase Systems v. CL Systems, Inc.*, 5640 F.2d 109, 112.................44

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).........................................3, 27

*Eckes v. Card Prices Update*, 736 F. 2d 859, 863-64 (2d Cir. 1984).......35

*EFS Marketing, Inc. v Russ Berrie & Co.*, 76 F.3d 487, 493-94 (2nd Cir. 1996) ..............................................................................................52

*Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 707 (Minn. 1992)..5, 20, 21

*Ford Motor Co. v. B & H Supply, Inc.*, 1987 U.S. Dist. LEXIS....7, 61, 62

Appellate Case: 11-2959     Page: 4     Date Filed: 12/30/2011 Entry ID: 3864389

*Garrison v. Baker Hughes Oilfield Operations, Inc.,* 287 F.3d 955, 962 (10th Cir. 2002) ................................................................................... 57

*General Universal Sys., Inc. v. Lee,* 379 F.3d 131, 143 (5th Cir. 2004) .. 33

*Giles v. Miners, Inc.,* 242 F.3d 810 (8th Cir. 2001) ................................. 27

*Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983) ........................... 7, 59, 60

*Herron v. Green Tree Acceptance, Inc.,* 411 N.W.2d 192, 195 (Minn.Ct.App. 1987) ............................................................................ 20

*Iconix, Inc. v. Tokuda,* 457 F. Supp. 2d 969, 1000 (N.D. Cal. 2006) 6, 52, 57

*IDX Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 583-84 (7th Cir. 2002) 5, 52, 54, 56

*In re Gully v. Gully,* 599 N.W.2d 814 (Minn. 1999) ................................ 28

*Innovative Home Health Care v. P.T.-O.T. Assoc. of the Black Hills,* 141 F.3d 1284, 1286 (8th Cir. 1998) ........................................................... 26

*I-System, Inc. v. Softwares, Inc.,* 2004 U.S. Dist. Lexis 6001 (D. Minn. 2004) ................................................................................................ 6, 53

*Kelly v. Golden,* 352 F.3d 344, 353 (8th Cir. 2004) ................................ 27

*Kern v. TXO Production Corp.,* 738 F.2d 968 (8th Cir. 1984) ................ 29

*Lotus Dev. Corp. v. Borland Int'l,* 49 F.3d 807, 814-15 (1st Cir. 1995) .. 33

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, (Fed. Cir. 1995) ..................................................................................................... 36

*Mitel, Inc. v. Iqtel, Inc.,* 124 F.3d 1366, 1372-73 (10th Cir. 1997) .......... 33

*Morrisette v. Harrison Int'l Corp.,* 486 N.W.2d 424, 427 (Minn. 1992) . 21

*Oglala Sioux Tribe v. C & W Enters., Inc.,* 542 F.3d 224, 229 (8th Cir. 2008) ..................................................................................................... 44

Appellate Case: 11-2959    Page: 5    Date Filed: 12/30/2011 Entry ID: 3864389

*Patriot Funding, LLC v. Lefort*, 2006 U.S.Dist. Lexis 40427 (D. Mass. 2007) .......................................................................................... 6, 53

*Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626-27 (Minn.1983) ............................................................................................... 19, 20

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2005) .......................................... 44

*Sigma-Aldrich, Inc., v. Open Biosystems, Inc.*, 521 F. Supp. 2d 975, 982 (E.D. Mo. 2007) .................................................................................... 36

*Taylor Corp. v. Four Seasons Greetings*, 403 F.3d 958, 964 (8th Cir. 2005) .................................................................................. 5, 33, 39, 41

*The Warehouse Restaurant, Inc. v. The Customs House* .................... 7, 62

*Transclean Corp. v. Bridgewood Servs., Inc.*, 134 F. Supp. 2d 1049, 1052 (D. Minn. 2001) .................................................................................... 61

*U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933) .............. 5, 41

*U.S. v. Ruff*, 472 F.3d 1044, 1047 n. 4 (8th Cir. 2007) ........................... 38

*U.S. v. Two Elk*, 536 F.2d 890 (8th Cir. 2008) ...................................... 27

*United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir. 2000) ................. 30

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615-16 (Fed. Cir. 1999) ..................................................................................... 4, 36

*Warren v. State Farm Fire*, 531 F.3d 693 (8th Cir. 2008) ...................... 28

*Watkins Inc. v. Chilkoot Distributing, Inc.*, 655 F.3d 802, 805 (8th Cir. 2011) ................................................................................................... 21

## STATUTES

The Bayh-Dole Act, 35 U.S.C. § 200 ................................................ 36, 37

## OTHER AUTHORITIES

4 <u>Nimmer on Copyright</u>, § 14.06(C) (2006) ........................................ 45, 54

Executive Order 12591 (April 18, 1957) .................................................. 38

Presidential Memorandum to the Heads of Executive Departments and Agencies (February 15, 1983) .............................................................. 38

Webster's Ninth Collegiate Dictionary; Merriam Webster (1980), p.837 ..................................................................................................... 44

RULES

Fed. R. Civ. P. 65(d)(1)(B) ................................................................. 45, 48

Rule 702, Federal Rules of Evidence ....................................................... 3

REGULATIONS

37 C.F.R. §401.14 ................................................................................ 36

48 C.F.R. 27.302(a)(3) ......................................................................... 37

Appellate Case: 11-2959     Page: 7     Date Filed: 12/30/2011 Entry ID: 3864389

# JURISDICTIONAL STATEMENT

This is an appeal from a final Order of May 26, 2011, of the United States District Court for the District of Minnesota, and judgment of May 27, 2011, following jury verdicts. On June 22, 2011, Dr. Elkin filed timely post trial motions to alter, amend or correct the judgment, judgment as a matter of law, and, in the alternative, for a new trial, which were denied on August 9, 2011. Elkin also appeals (1) exclusion of important expert and fact testimony, based on a December 12, 2010 *Daubert* order and related evidentiary rulings, precluding testimony by a retained expert and Elkin himself, and (2) the August 24, 2011 Order awarding attorneys' fees totaling $1,900,139.30 to Mayo. On September 7, 2011, Elkin timely filed his Notice of Appeal.

The District Court had jurisdiction under 28 U.S.C. §1332. Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000. Dr. Elkin is an individual residing in New York State; both Mayo entities are Minnesota not-for-profit corporations with principal places of business in Rochester, Minnesota; and Cerner is a Delaware corporation with its principal place of business in Kansas City, Missouri.

1

This Court has jurisdiction of the final judgment and related Orders of the District Court under 28 U.S.C. §1291.

2

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

A.    Whether the District Court abused its discretion in excluding testimony at trial by Elkin and by Dr. Love, based on a *Daubert* ruling as to software developed by Dr. Elkin, and in excluding defense expert and direct observation testimony regarding parts of Mayo-claimed software traceable to software Dr. Elkin developed before his employment by Mayo.

Authorities:

1.    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2.    Rule 702, Federal Rules of Evidence.

3.    *Computer Associates Int., Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992).

4.    *Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615-16 (Fed. Cir. 1999).

B.    Whether the District Court erred in declining to enter findings of the jury in favor of Elkin on contract terms, including Mayo's obligation to fully pay and account for royalties accruing to Elkin without withholding or offset of litigation costs.

3

Authorities:

1.  *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188 (2011).

2.  *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933).

3.  *Taylor Corp. v. Four Seasons Greetings*, 403 F.3d 958, 964 (8th Cir. 2005).

4.  *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 707 (Minn. 1992).

C.  Whether the District Court violated Rule 65(d) requirements, including reasonable detail and clarity, and abused its discretion by issuing an overbroad injunction, enjoining Dr. Elkin from use of any "parts" of the software.

Authorities:

1.  *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002).

2.  *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 1000 (N.D. Cal. 2006).

3.  *Patriot Funding, LLC v. Lefort*, 2006 U.S.Dist. Lexis 40427 (D. Mass. 2007).

4

4.    *I-System, Inc. v. Softwares, Inc.*, 2004 U.S. Dist. Lexis 6001 (D. Minn. 2004).

D.    Whether the District Court abused its discretion in awarding attorneys' fees of $1,900,139.30 to plaintiff Mayo, by Order of August 24, 2011.

Authorities:

1.    *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

2.    *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

3.    *Ford Motor Co. v. B & H Supply, Inc.*, 1987 U.S. Dist. LEXIS 14939, at *12-13 (D. Minn. Apr. 13, 1987).

4.    *The Warehouse Restaurant, Inc. v. The Customs House Restaurant, Inc.*, 219 U.S.P.Q. 1221, 1223-24 (N.D. Cal. 1982).

Appellate Case: 11-2959    Page: 12    Date Filed: 12/30/2011 Entry ID: 3864389

## STATEMENT OF THE CASE

A.    <u>Nature of the Case</u>.

This suit arises out of claims and counterclaims between Elkin and his former (1996-2008) employer, Mayo, to determine their respective rights in multiple software programs applying "natural language processing" to medical text. Mayo alleged that these programs arose out of Elkin's research at Mayo and became Mayo's property by virtue of internal Mayo policy and Elkin's employment between 1996 and 2008. Mayo sought a declaration of ownership and an injunction against continued use or disclosure by Elkin of the programs under theories of breach of contract, interference with contractual relationship, conversion, breach of fiduciary duty, trespass to chattels, and statutory and common law misappropriation of trade secrets. Second Amended Complaint, App. 801-922. Mayo's licensee Cerner was a co-plaintiff and co-defendant on the counterclaim. Dr. Elkin sought, in addition to a declaration of his rights in the programs, recovery of his share of royalties under two assignment agreements he gave Mayo in 2002 and 2003, for two specific programs, the "HCML Toolkit" and the "E & M Coding system", and an accounting. Dr. Elkin alleged breach of

6

contract, breach of employment agreement, and breach of fiduciary duty by Mayo. Answer and Counterclaim, App. 927.

B.     Course of Proceedings and Disposition.

Mayo filed suit first in Mayo's home county, Olmstead, Minnesota (App. 7), and immediately attempted service by a January 21, 2009 summons (App. 1), served on Mrs. Elkin on January 22, 2009 (Elkin Declaration, App. 40, 42), at the Elkins' unsold home in Minnesota. *Id.* Elkin, who had moved permanently to New York City for a new job at Mt. Sinai in August of 2008, then sued Mayo in the Southern District of New York. App. 1854. Elkin removed the Minnesota state action to the United States District Court for the District of Minnesota. App. 1. Mayo moved the District Court to stay the parallel Southern District of New York action. App. 85. Ultimately, the New York case was transferred and consolidated in the District of Minnesota by Stipulation, and Order, App. 185 and 190.

The consolidated case was assigned to United States Senior District Judge David S. Doty. A joint Amended Complaint by Plaintiffs added two declaratory judgment Counts and Elkin's corresponding Answer and Counterclaim followed. App. 57 and 143. After extensive

7

discovery and motion practice, the case was tried before a jury for less than days from April 19, 2011 to April 26, 2011. The jury returned verdicts on April 27, 2011. App. 4347-4350.

The verdicts were: (1) in favor of Elkin on the claim for breach by Mayo of the employment contract and the one assignment submitted to the jury, with $143,222.20 awarded him; and (2) in Mayo's favor on all eight of its Counts arising out of ownership of the software. *Id.* On the non-jury claims, the District Court declared that Mayo owned the programs. The District Court had instructed the jury that Mayo owned a list of software. A-60–61. This instruction followed a stipulation of the parties regarding ownership of certain specific programs developed at Mayo. The list of software, for which the issue of ownership had been taken from the jury, was also ultimately declared to be Mayo property in the District Court's final Order and Judgment.

The jury also found against Mayo on its claim that the agreements and Mayo policy permitted Mayo to withhold fees and costs of the litigation from royalties otherwise due Elkin. A-21, A-62.

The District Court issued a final Order on May 26, including entry of the injunction sought by Plaintiffs, essentially adopting a draft order

submitted by Mayo on May 14. The order included not only the specifically listed programs, but also "any parts" of the programs, as Mayo property, and enjoined Dr. Elkin from *any use* or disclosure of "any parts" as well. *Id.* Dr. Elkin filed post trial motions and supporting memoranda, App. 4485, 4487 and 5722 (Reply), which the District Court denied on August 9. App. 5737-5746. The District Court also entered a separate Order awarding $1,900,139.30 in attorneys' fees against Elkin on August 24, 2011. App. 5754, A-43-50.

This appeal followed on September 7, 2011. App. 5762.

## SUMMARY OF ARGUMENT

Dr. Elkin, as the inventor and author of the disputed software in its iterations and revisions, sought to give the jury testimonial demonstrations and "mappings" tracking his usage and further development of key or "core" program parts. This excluded testimony would explain the "engine" of the language processing for each program, from his pre-Mayo work that began in 1987, nine years prior to his starting work for Mayo, to the versions current at Cerner's 2008 acquisition of licenses for them and also the current Cerner versions. Elkin is the leading expert on the source of each key point, its time of creation or modification, its source, and its authorship.

The District Court conducted a brief trial focused almost entirely on the parties' respective rights to programs as integral wholes, and as licensed to Cerner, without regard to the parts.

The District Court excluded Elkin's and expert Love's testimony in its *Daubert* ruling and expanded the testimony bar to essentially all expert and even much fact evidence under the so-called "AFC"[1] test. That test does not apply to literal copying, particularly not to a witness'

---

[1] The "AFC" test is defined *infra* at 28.

Appellate Case: 11-2959    Page: 17    Date Filed: 12/30/2011 Entry ID: 3864389

recitation of his own copying. Despite admission of no evidence of ownership of any particular parts, routines, modules, elements, or novel features of the programs, the District Court determined as a matter of law that the list of programs were Mayo property. The Order also included vague, undefined concepts, such as the "core" and "engine" of the software. Under *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188 (2011), Mayo has no rights in the programs except by assignment from Elkin. The jury found a written assignment agreement for one program (the HCML toolkit) and awarded Elkin his royalties under it but rejected any further implied or unilateral terms resulting from Mayo policies submitted to them. The parties' stipulation became the sole basis of the District Court's award of ownership rights to Mayo, but that stipulation applies only to the whole software and says nothing about "parts."

The Order and judgment also failed to accurately reflect the jury's findings in favor of Dr. Elkin as to the content of his employment agreement, Mayo's breach, Elkin's right to royalties, and the impropriety of Mayo's withholding of royalties.

Finally, the award of attorneys fees should be set aside because neither the reasonability nor the content of the fees, nor their relation to the sole Count (one of ten) allowing such fees, were established.

Appellate Case: 11-2959    Page: 19    Date Filed: 12/30/2011 Entry ID: 3864389

## ARGUMENT

## I.  Statement of the Facts

### A.  Parties

Dr. Peter Elkin is a physician, professor of medicine, researcher and developer of computer programs, most recently employed by Mt. Sinai School of Medicine in New York as Professor and Vice-Chairman of its Department of Internal Medicine and Director of its Center for Biomedical Information. App. 14. Mayo acknowledges that Dr. Elkin is "a high-level researcher and clinician." App. 7. He has been the principal investigator designated by United States agencies, including the Veterans Administration (VA), Centers for Disease Control and Prevention (CDC), and the National Institutes of Health for a series of grants supporting the development of the software at issue in this litigation.[2] His field of research, applying "natural language processing"

---

[2] A brief but instructive history of natural language processing in medical software from "MUMPS," an early computer language used in Massachusetts hospitals when Elkin was at Harvard, through his later Mayo-era software appears in Elkins' article, which is Plaintiffs' Exhibit 314, App. 6616. The article discusses improving pneumonia care through software like the Mayo/Elkin software. Elkin is the lead author. The paper is co-authored by his colleagues at Mayo, the VA and the CDC, which funded his research.

Appellate Case: 11-2959    Page: 20    Date Filed: 12/30/2011 Entry ID: 3864389

to medical text, was essentially the same during his employment at Mayo from 1996 to 2008, at Harvard before, and at Mt. Sinai from 2008 to 2011, App. 6703-6720, including many years of federally-funded research.

Dr. Elkin's series of grants at Mayo, from The Centers for Disease Control and Prevention (CDC), continued from 2005 until his 2008 departure from Mayo to Mt. Sinai, see App. 7492-7544. NIH and VA grants were also listed in his response to Mayo Interrogatory No. 2 of Mayo's First Set of Interrogatories, App. 6497-6514. The 2008 grants were transferred to Mt. Sinai and continued there. *See, e.g.,* App. 7492.

Plaintiff Mayo[3] is a major teaching hospital and research institution, like Mt. Sinai. Cerner is a private corporation engaged in the development and sale of software and information technology products to the healthcare industry, including the programs licensed by

---

[3] Plaintiffs Mayo Clinic and Mayo Foundation are Minnesota not-for profit Corporations based in Rochester, Minnesota. Their pleading states that Mayo Foundation was formed in 1965 "to handle the research and education phases" of Mayo Clinics. App. 57-84, at App. 59. The two have acted together and by the same counsel throughout this litigation. For simplicity, they will be referred to simply as "Mayo" except where the distinction is significant in a particular context.

Mayo to Cerner in exchange for royalties paid to Mayo. App. 57-84 at App. 59 and 67.

At Mayo, Elkin continued his prior work, and produced a Java version of certain software in 1998. In 1999 Mayo formed "Conceptual Health Solutions, Inc." (CHS), which worked with private investors to commercialize the Elkin medical software. CHS held Mayo's licenses for Elkin's software in a "Lingologix" fictitious name and business unit of CHS acquired by Cerner in 2008, together with the licenses. CHS commercially licensed Elkin/Mayo software from at least early 2002.

B.    The Contracts of Employment and of Assignment

Mayo employed Elkin from 1996 to 2008 without a bilateral or written employment agreement signed by the parties.  Mayo did, however, have written policies, some of which Mayo asserts provided terms for an Elkin employment contract, notably Mayo's claim to ownership of Elkin's inventions, intellectual property, and the programs themselves, at least to the extent Elkin developed them at Mayo. App. 57-83, at App. 61 and 63.  The assignment to Mayo by Elkin most relevant here, the 2002 HCML assignment, A-54, references a policy giving Mayo ownership and the inventor a share of any royalties, but

15

expressly states only those two essential terms: (1) payment to the inventor of his royalty share on a "40-20-40" basis, meaning a 40% share of royalties paid to the inventor or inventors,[4] and (2) ownership of inventions by Mayo to the extent it resulted from "Mayo research." A-56. *See also*, App. 7194-7201 and 7335-39.

Dr. Elkin does not dispute that the specific programs in the District Court's final Order reached their final form, as integral wholes and as licensed to Cerner in 2008,[5] during Elkin's employment. Elkin stipulated to ownership of these specific programs at trial. App. 5403, A-53. The stipulation made clear that certain software or parts were not covered by the stipulation, namely the "tails and heads," that is the software or parts of software developed by Dr. Elkin before he joined

_____

[4] No party has disputed the terms of the written assignments. Two relevant assignments of 2002 and 2003, respectively, were attached by Mayo to its earliest and subsequent Complaints. Later pleadings added further examples of other assignments, some of which also confirmed the "40-20-40" split or 40% inventors share. One such other assignment gave Elkin 59% of the inventors' 40% share. Mayo, however, also claims ownership in programs for which no such bilateral written assignment agreement exists, based on Mayo policy.

[5] The original license was by Mayo to CHS, an entity formed by Mayo to hold the software rights, later through the CHS "Lingologix" unit sold to Cerner in 2008.

Appellate Case: 11-2959    Page: 23    Date Filed: 12/30/2011 Entry ID: 3864389

Mayo and after he left. In other words, "that software that was developed by Mayo is owned by them" but no more. *Id.*

As to any further terms becoming part of a unilateral contract, whether of employment or assignment, employee policies constitute terms of an employment contract only if they meet the requirements of a unilateral contract, namely that: (1) the terms are definite in form; (2) the terms are communicated to the employee; (3) the offer is accepted by the employee; and (4) consideration is given. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626-27 (Minn.1983). Elkin maintains that details or parts of Mayo policies not established as having been "communicated" to him are not part of Elkin's unilateral contract with Mayo. *See Campbell v. Leaseway Customized Transport*, 484 N.W.2d 41, 44 (Minn. App. 1992) (in order to create a binding unilateral contract, "[t]he offer must be definite in form and must be communicated to the offeree") (*citing Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983). *See also, Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 707 (Minn. 1992) (quoting *Herron v. Green Tree Acceptance, Inc.*, 411 N.W.2d 192, 195 (Minn.Ct.App. 1987):

17

> [F]or a unilateral contract to be formed the offer must be *communicated to the offeree*. If the offer does not exhibit the objective intent to apply to a particular employee, then a contract cannot be formed with that individual, regardless of the definite form of the offer itself. In such a case the employee is not the offeree to whom the offer must be communicated for formation of a contract. Whether the proposal is meant to be an offer for a unilateral contract with a particular person is determined by the outward manifestations of the parties and not their subjective intentions. *Id.*

Simply put, the "decisive question" is whether the policies were "communicated to the employee seeking to invoke its provisions in a way that objectively manifests an offer to contract for employment." *Feges*, 483 N.W.2d at 707. "In making the determination, the 'surrounding facts and circumstances in the context of the entire transaction, including the purpose, subject matter, and nature of it' are relevant." *Watkins Inc. v. Chilkoot Distributing, Inc.*, 655 F.3d 802, 805 (8th Cir. 2011) (quoting *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992)). This is a question of fact for the jury to determine. *Feges*, 483 N.W.2d at 707. In the one instance in which the jury decided whether a Mayo policy (not also reflected in the written assignment) formed part of the unilateral contract, they decided it did

Appellate Case: 11-2959    Page: 25    Date Filed: 12/30/2011 Entry ID: 3864389

not. In awarding royalties to Elkin, the jury necessarily decided that the alleged Mayo right to withhold or offset royalties to pay its attorneys' fees was not part of the parties' contract. *See* A-21, A-62.

The special verdict below confirmed, by the jury's special interrogatory answers, the breach by Mayo of the employment agreement and the assignment, a finding against Mayo's claim that the agreement permits Mayo to withhold an offset. A-21; App. 4400-4411. Further, even if Mayo claimed to have an unwritten unilateral assignment from Elkin by Mayo policy, that policy does not contain the necessary elements for a true assignment agreement: identification of the subject matter assigned, *i.e.* a specific "invention," and the specific terms of payment of royalties, meaning not just 40% to unknown inventors, such as Elkin, but specific identification of the inventor or inventors and the royalties to be paid to each. Obviously, the co-inventorship shares will vary from invention to invention, assignment to assignment.

Finally, Mayo's obligation to pay the 40% share to its inventors is not only contractual, but also statutory, because federal law requires non-profit grantee organizations like Mayo, in order to take ownership

19

of federally funded research results, to pay their inventors an amount established by policy. See 35 U.S.C. 202 (c)(7)(B).

C.   The Dispute

Upon leaving Mayo in August 2008, Dr. Elkin applied to transfer to Mt. Sinai both of his CDC and his VA federal grants and certain equipment purchased with grant funds, including computers on which his work was developed and stored, including the "code repository" or computers containing the "source code" for his programs. Some computers remaining at Mayo but to be transferred to other users were erased in accordance with Mayo policy, App. 5284 and 5440, but the code for the software developed in Dr. Elkin's lab, in "object code" format but allegedly not "source code" format, remained at Mayo. App. 5281-85.  The then-current grants were transferred to Mt. Sinai with Mayo's approval, App. 5268-69, 5308, and 7133-36, as were the grant-funded computers.   App. 5284 and 7729-7732. Dr. Elkin then continued his research, including presenting at professional and scientific gatherings.

In November 2008, representatives of Cerner attended a conference of the American Medical Information Association at which

20

Dr. Elkin presented, observing that Dr. Elkin continued to present publically on his programs and related research. App. 5338-41. Cerner contacted Mayo. App. 57, 67-68. Previously, CHS, a Mayo-related entity, had also complained to Mayo about Dr. Elkin's continued research and presentation of his results on the basis of the exclusive Mayo license to CHS[6] and its confidentiality. Mayo permitted Dr. Elkin to continue, and advised him that he had a "right" to continue his research and scholarly presentations, at least when it was CHS complaining. When Cerner complained, however, in the wake of its multi-million dollar purchase of Lingologix and the "exclusive" software license, Mayo's response was different. Mayo's regular counsel for the instant litigation sent a cease and desist letter to Dr. Elkin on December 17, 2008. App. 6966–67, *See also,* App. 5395–99.

Dr. Elkin retained counsel in New York for his suit there, Jonathan Willens, and later a Minnesota attorney, Mr. Arretts, for the removed and consolidated action. Both were driven from the case by the costs of discovery and Elkin's inability to pay, after $150,000 in

---

[6] The same license later obtained by Cerner in its acquisition of the CHS Lingologix unit and the occasion for its complaints after the AMIA conference, and leading to this litigation..

attorneys' fees accrued in the first few months of discovery. App. 959–89. These attorneys' declarations in support of their withdrawals, App. 981–83 and 968–77, show how the extensive discovery granted to Cerner and Mayo quickly ran Elkin's fees up to more than $200,000 and left him unable to obtain representation. He appeared *pro se* for most of the case.

W. Patrick Judge of Minnesota entered the case on September 17, 2010, App. 2659–60, but then sought leave to withdraw on March 23, 2011, App. 3627-33, but was required to continue through trial by the District Court. App. 3664-65. Dr. Elkin's present counsel was retained and appeared shortly before the post-trial motions were due.

D. <u>The Trial, District Court Orders, Judgment and Attorneys' Fees Award</u>

From April 20, 2011, to April 26, 2011, Senior Judge Doty conducted a jury trial of 5 partial and whole days. The jury returned a verdict both (1) in favor of Dr. Elkin, awarding him shared royalty payments from Mayo and rejecting Mayo's claimed right of withholding litigation costs; and (2) in favor of Mayo on the counts arising out of Mayo's claim to ownership of the software. A-19 – A-21. The non-jury

22

declaratory judgment counts on both sides were effectively decided by the District Court's instructions taking the ownership issue away from the jury. See Instruction No. 20, A-60. No damages were awarded to Mayo. The District Court failed to declare any ownership rights of Elkin.

Judge Doty's May 26 Order not only enjoined Elkin from use of the disputed software programs, but also enjoined use or disclosure of any "parts" of the software. The Order, which concerned Mayo-era programs, also required Dr. Elkin to return all data and storage media in his possession containing any part of the Mayo-era software to Mayo. Dr. Elkin returned all data and media from his new laboratory at Mt. Sinai, which by then also included new software he developed at Mt. Sinai. Elkin Declaration, App. 5732-33.

### III.  Argument

### A.  Standards of Review

In deciding Rule 59 motions to alter or amend judgments, or for judgment as a matter of law, the district court has broad direction. *E.g. Innovative Home Health Care v. P.T.-O.T. Assoc. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998). The standard of review for Issue 1

below,[7] concerning the District Court's exclusion of testimony, and of expert testimony under Federal Rule of Evidence 702, is "abuse of discretion", *U.S. v. Two Elk*, 536 F.2d 890 (8th Cir. 2008). The same is also true specifically as to rulings made under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92 (1993). *See, e.g., Giles v. Miners, Inc.*, 242 F.3d 810 (8th Cir. 2001).

The pertinent standard of review as to issues 2 and 3 below, concerning the District Court's own findings, and the clarity, accuracy, and reasonable detail regarding its final order, judgment and injunction is also "abuse of discretion". *E.g., Kelly v. Golden*, 352 F.3d 344, 353 (8th Cir. 2004).

The standard of review for issue 4 below, concerning the District Court's award of attorneys' fees is also abuse of discretion. *E.g., Consolidated Beef v. New York Life Ins.*, 949 F.2d 960, 966 (8th Cir. 1991). Insofar as the fee award is based on a Minnesota statute, it is worth noting that the Minnesota courts also review awards of attorneys'

---

[7] The first two listed issues in Appellant's original Statement of Issues on Appeal have been combined into a single issue for this brief, as have the fourth and fifth issues as originally listed there.

Appellate Case: 11-2959    Page: 31    Date Filed: 12/30/2011 Entry ID: 3864389

fees under an abuse of discretion standard. *E.g., In re Gully v. Gully,* 599 N.W.2d 814 (Minn. 1999).

For the District Court's decision to direct the jury's verdict in finding the listed software programs to be Mayo property, the standard of review is *de novo, e.g., Warren v. State Farm Fire,* 531 F.3d 693 (8th Cir. 2008).

Finally, because so many of the issues presented on this appeal are governed by the "abuse of discretion" standard, it is worth noting that this Circuit's definition of "abuse of discretion," as set forth in *Kern v. TXO Production Corp.,* 738 F.2d 968 (8th Cir. 1984), is:

> An abuse of discretion, on the other hand, can occur in three principal ways: when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment. And in every case we as an appellate court must be mindful that the district courts are closer to the facts and the parties, and that not everything that is important about a lawsuit comes through on the printed page.

738 F. 2d at 970.

### B.   Argument

**1.   The District Court erred in granting the Motions in Limine of Plaintiffs-Appellees, particularly in the District Court's *Daubert* ruling and its extension to exclude testimony**

25

and other evidence at trial by Dr. Elkin and Dr. Love as to software developed by Dr. Elkin, and in excluding the defense expert and direct observation testimony regarding parts of Mayo-claimed software traceable to Dr. Elkin's software developed before his employment by Mayo, whether or not the "AFC" test applies.

        a.    "Parts" evidence was precluded by the incorrect *Daubert* ruling.

By its *Daubert* rulings excluding expert testimony by Dr. Elkin and his expert, Dr. Love, the Court eliminated both (1) the leading expert on the software at issue--its primary creator and the supervisor of the team supporting its creation and further refinements --and (2) an expert credentialed in the specific field of software development out of which the disputed software arose, specifically as the creator of the programming language used on the iPhone and iPad. App. 3570-3574. Their respective *curricula vitae* established their credentials. See App. 3042-3047 and App. 6703-6720. Their dual testimony as both experts and, from review of the software if nothing else, as fact witnesses was permissible. *See United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir. 2000).

Further, Mayo's evidence, with rare exceptions, dealt with the six disputed software programs only as units, corresponding to its licensing

obligations to Cerner. The District Court could have easily drafted a final Order within those limits, but the District Court ultimately accepted the "parts" language Mayo drafted for the final Order, although the evidence said essentially nothing about the development, timing, or protectibility of any particular "parts" of the software, precisely because of the District Court's evidentiary rulings. The evidentiary rulings, excluded material testimony of the one person best qualified to sort out the origin of the "parts" of the programs, Dr. Elkin himself.

The *Daubert* ruling started as a straightforward argument by Mayo counsel objecting to four specific items of proposed expert testimony by Elkin, appearing from his expert witness report, which "mapped," or "compared" parts of the programs. Cerner, under a similar argument, opposed Love's expert testimony claiming that copying had occurred. The effect of the District Court's ruling was to exclude "mapping," or "comparison" of the currently marketed Cerner code with Elkin's pre-1996 MUMPS code, A-13–17, from which an expert opinion on the issue of copying or infringement on Cerner's current programs would have been offered.

The District Court's original *Daubert* Order simply accepted Mayo's and Cerner's position that the "AFC" test applied, though not yet accepted by this Circuit, and treated it as the exclusive test for submission of testimony. App. 3572-3574. But application of the "AFC" standards, to the exclusion of other tests, of the witness's own observations, and indeed memory of doing the "copying" himself, is an extreme to which even the Circuit that created the AFC test did not go. *See Computer Associates Int., Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992). In doing so, the District Court was simply wrong. By its own terms, the AFC test is only useful to analyze alleged non-literal copying, *i.e.* to sort out broad similarities of allegedly original and allegedly derivative or copied work.

The Second Circuit developed the "AFC" or "Abstraction Filtration Comparison" test in *Computer Associates Int., Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992), for comparing rough similarity, "non-literal" copying, and "copying of non-literal elements" in computer programs. 982 F.2d at 706. While other Circuits have adopted the AFC test, the

Eighth Circuit has not at this point.[8]  However, AFC is not the only test for copyright or copyright interpretation. Literal copying or proved copying of literal elements of a work such as a program can be proven by other evidence, not exclusively by an expert's "AFC" test.  *See General Universal Sys., Inc. v. Lee*, 379 F.3d 131, 143 (5th Cir. 2004) (the Fifth Circuit has not yet had the opportunity to evaluate whether it would apply the *Altai* test to allegations of literal copying of source or object code); *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1372-73 (10th Cir. 1997) (holding that a complete abstraction-filtration-comparison need not be performed where there was literal copying, "[n]ot every case requires an extensive abstraction-filtration-comparison analysis"); *Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807, 814-15 (1st Cir. 1995) ("[w]hile the *Altai* test may provide a useful framework for assessing the alleged non-literal copying of computer code, we find it to be of little help in assessing whether the literal copying of a menu command hierarchy constitutes copyright infringement"); *Data Gen. Corp. v.*

---

[8] Appellant's research indicates that as of this writing, no Eighth Circuit opinion has adopted the "AFC" test. The Eighth Circuit test for "substantial similarity" remains as set forth in *Taylor Corp. v. Four Seasons Greetings*, 403 F.3d 958, 964 (8th Cir. 2005), which Appellant argues should be applied in this case.

*Grumman Sys. Support*, 825 F. Supp. 340, 355 (D. Mass. 1993) (finding the AFC test not applicable to cases with direct evidence of copying). *See also, Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 844-45 (Fed. Cir. 1992) (in addition to *Altai's* AFC test, the Court also permitted expert testimony regarding the "striking similarities" between the computer programs at issue).

Both Dr. Love and Dr. Elkin were offered to testify as to literal copying. Dr. Love did not perform the AFC test, but only because he performed instead a more stringent, "clean room" test, finding literal copying in the Cerner "Discern nCode™" source code and intermediate Mayo versions, by showing repetition of misspellings and Elkin-unique terms in lines of the code from Dr. Elkin's original pre-1996, pre-Mayo "MUMPS" code right through to the 2008 software Cerner now calls Discern nCode™ – without any significant change shown by the evidence. Cerner did dispute whether the code Love and Elkin analyzed was Cerner's current code, rather than the same thing in its 2004 or 2008 versions as acquired by Cerner and as it existed after the naming of the software as "Opticode" and later "GoCode" at CHS, but before the

name "Discern nCode" was applied at Cerner.[9] This tack only amplifies the impact of the exclusion of contrary evidence.

Dr. Elkin provided by declaration a list of many examples of specific files within the programs that were copied or derived from his pre-Mayo work. App. 4224-4229. The Federal Circuit has routinely held that an inventor is a competent witness to explain his invention. *Voice Techs. Group, Inc. v. VMC Sys., Inc.,* 164 F.3d 605, 615-16 (Fed. Cir. 1999). *See also, Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, (Fed. Cir. 1995) (in banc) (noting that "the inventor himself may qualify as an expert); *Sigma-Aldrich, Inc., v. Open Biosystems, Inc.,* 521 F. Supp. 2d 975, 982 (E.D. Mo. 2007) (noting that testimony of the inventor may be helpful to the Court in claim construction; an inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims).

Even if this Court adopts the AFC test for this Circuit as *an* appropriate test procedure to test for non-literal copying, and by which

---

[9] These common errors found in the two codes, on their own, strongly suggest literal copying. *See, Atari Game Corp. v. Nintendo of America Inc.,* 975 F.2d 832, 844-45 (Fed. Cir. 1992); *Eckes v. Card Prices Update,* 736 F. 2d 859, 863-64 (2d Cir. 1984).

to exclude expert testimony, that test can surely not be used to excuse the rejection of both expert and fact evidence of literal copying from the direct observation by Love and Elkin of the code, or their conclusions as to literal copying of the pre-Mayo, Mayo and Cerner code, much less the memories of the person who himself did the "copying" from version to version of the software, namely Elkin.

In its *Daubert* Order, the District Court ruled that Dr. Elkin "is not qualified to present expert opinion about the similarity between Discern nCode source code and Mumps source code" App. 3572-3574, A-14, 15. The District Court revisited this issue in ruling on the parties' motions in limine, and while reiterating its opposition to letting Dr. Elkin testify as an expert as to the similarities between source codes, the District Court specifically noted that Dr. Elkin would be allowed to testify as a fact witness regarding the work he performed. App. 7866-7867. The purpose of this testimony was to show that the code developed by Dr. Elkin before starting at the Mayo Clinic remained his property and that Mayo transferred it without authorization.

Pursuant to verbal order of the District Court, Dr. Elkin's counsel sent an e-mail to Mayo counsel listing the demonstrative evidence and

related testimony Dr. Elkin planned to use at trial. Of particular importance were the demonstratives and testimony concerning the code Dr. Elkin developed using code from before his time at Mayo, including MVP, MVS, and MCVS, as well as the LingoLogix code transferred to Cerner and post-Mayo code. In a letter to the judge on the Sunday before Dr. Elkin was to testify, Mayo counsel argued that Dr. Elkin's proposed demonstration would violate the court's *Daubert* order and motion in limine rulings because it "purported expert testimony, as well as undisclosed use of software programs that Dr. Elkin has never before produced."[10]

Taking up the issue on the following Monday morning of trial, the District Court essentially barred all of Dr. Elkin's demonstrative evidence listed in the letter contending that it was encompassed in the Court's earlier motion in limine rulings. App. 5257, A-8. The effect of this ruling was the exclusion of Dr. Elkin's evidence of tracing (or

---

[10] While this letter is not part of the appendix, Dr. Elkin is filing a motion to supplement the record pursuant to Federal Rules of Appellate Procedure 10(e) and 30, and include this letter as it was specifically cited to and referenced by the District Court at trial. *See U.S. v. Ruff*, 472 F.3d 1044, 1047 n. 4 (8th Cir. 2007) (supplementing record to include a letter that was "material to the record because it fully describes the district court's actions")

Appellate Case: 11-2959    Page: 40    Date Filed: 12/30/2011 Entry ID: 3864389

"mapping, or "comparing") the several versions of code, even the 2008 version of the code as still maintained in 2008 under Dr. Elkin's direct observation in his own laboratory at Mayo, to all of which Dr. Elkin was competent as a fact witness to testify. The District Court's ruling was in reality much broader than its *Daubert* Order or subsequent motion in limine rulings and barred precisely the kind of evidence that should have been allowed under *Taylor*.

**2.    The District Court abused its discretion in failing to enter findings of fact and judgment in favor of Elkin and against Mayo on Mayo's obligation to fully pay and account for royalties accruing to Elkin in light of the jury verdict awarding royalties to Elkin for his software.**

a.    **The jury made findings not fully and accurately reflected in the Order.**

The Order and Judgment acknowledges Mayo's breach of contract generally and awards Dr. Elkin a sum of damages specified by the jury, about half the December 2008 fund, but does not include the further findings by the jury: its resolution of the terms of the unilateral employment contract, the rate of royalties Mayo now owes Elkin, and the finding against Mayo's claim to withhold his royalties.    Elkin requested that the Order be amended to explicitly state Mayo's

Appellate Case: 11-2959    Page: 41    Date Filed: 12/30/2011 Entry ID: 3864389

breaches and obligations under the jury's findings. The jury instructions and special verdict questions were so framed that the jury could not find for Dr. Elkin unless they first found that (1) Mayo had breached Elkin's contract of employment and assignment, and (2) that Mayo did not have the contractual right it had claimed to withhold royalties, *i.e.* that the unilateral contract's terms did not contain that Mayo-alleged provision despite its appearance in Mayo policy. See Jury Instructions, App. 4351-4398, A-59-64.

      b.    Mayo's "rights" are not appropriately limited in the Order.

Mayo has no rights except by an assignment from Dr. Elkin. An inventor like Dr. Elkin retains intellectual property rights to his inventions, even as against the claims of his employer research institution, except to the extent of a valid, enforceable assignment to the employer. *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems. Inc.*, 131 S. Ct. 2188 (2011) (concerning patents and inventions); *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933) ). For such property, "title to it can pass only by assignment." *Id.* The same is true of copyright property rights. *See*

*Taylor Corp. v. Four Seasons Greetings*, 403 F.3d 958, 963 (8th Cir. 2005).

This remains so even though federal law grants ownership rights to the employer institution at which the inventor's federally-funded research was conducted, *see Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems. Inc.*, 131 S. Ct. 2188 (2011), and as also required contractually by a mandatory clause in the employing institutions' grants. *See*, 37 C.F.R. §401.14. The Bayh-Dole Act, 35 U.S.C. § 200 *et seq.* provides for the employer to obtain rights, but only if the employer fully discloses the invention to the government, properly documents its election of ownership, and updates the disclosure and claims for any new improvements to the invention. *See* §202(c).

As early as 2004 Mayo, in pressuring Elkin to give Mayo further written assignments to his programs, told him he must do so because "the Bayh-Dole act (*sic*).... [requires that] any IP generated under a government grant MUST be assigned to the institution." Plaintiff's

Trial Exhibit 440.[11]  In response, Elkin maintained that he developed "all of the IP." *Id.*  Mayo's effort to use Bayh-Dole as the legal support for its purported right to an assignment, rather than a Mayo policy and its purported incorporation as a term of a unilateral contract, is instructive now that *Roche* has taken that argument away.  After *Roche*, one might ask whether such a policy is even permissible but it is surely not a valid expression of a Bayh-Dole requirement.

The limited rights in intellectual property allowed to grantee institutions like Mayo are subject to the Bayh-Dole Act's requirement that the "commercialization" that Act allows  by the "use of patents arising from federally supported research or development" be "without unduly encumbering future research and discovery," *See* 35 U.S.C. 200, as also implemented in the corresponding Federal Acquisition Regulation, 48 C.F.R. 27.302(a)(3), and the mandatory patent clauses as

---

[11] While Mayo Clinic did not move to admit Plaintiff's Exhibit 440 at trial, Mayo counsel and witness Timothy Argo specifically referenced the e-mail in his direct examination, stating that "I sent him an e-mail asking him if he had made that statement . . ." And further, "Federal law obligates Mayo to . . . either take title of ownership of the stuff developed in the grant or return . . . it to the government." App. 5031. Dr. Elkin is filing a motion to supplement the record pursuant to Federal Rules of Appellate Procedure 10(e) and 30 to include this Exhibit as it constitutes a material omission from the record

Appellate Case: 11-2959     Page: 44     Date Filed: 12/30/2011  Entry ID: 3864389

incorporated in Mayo's and Elkins grants. *Id.* *See also,* Executive Order 12591 (April 18, 1957) and Presidential Memorandum to the Heads of Executive Departments and Agencies (February 15, 1983).

The impact of the District Court's injunctive relief on the public interest, in the form of the stated public purpose behind the limited rights Mayo is allowed to take and the avoidance of restraints on research, is a factor in evaluating the merits of an injunction granted, not only in cases of preliminary relief, see *Dataphase Systems v. CL Systems, Inc.,* 5640 F.2d 109, 112, and *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds,* 530 F.3d 724, 732 (8th Cir. 2005), but also in final injunctions, which are governed by the same factors, including "the public interest," *Oglala Sioux Tribe v. C & W Enters., Inc.,* 542 F.3d 224, 229 (8th Cir. 2008). This factor weighs heavily against the Order.

It is precisely Dr. Elkin's continuation of his research, development of software, and public presentation of his results that is the basis for Mayo and Cerner's complaints against him and their efforts to stop his continued efforts by the injunction at issue. Elkin

simply sought then, and now, to continue his research, carry out his grants, and promote the further development of the software.

An amended Order, accurately reflecting the parties' contracts and their terms, as found by the jury, should reflect the Mayo obligation to accrue and pay his 40% royalties to Dr. Elkin. The jury rejected the Mayo claim to infer unilateral contract terms that would permit offset or withholding of royalties based on Mayo's policy statements but not a written agreement. An effect, perhaps unintended, of the District Court's Order giving all "parts" of the software to Mayo, but only based on Elkin's inventorship, is the exclusion of any opportunity for a sharing of the inventorship among other inventors or contributors of parts, *i.e.*, that explicit splitting of the 40% inventor share as in the one proven and jury verdict-confirmed assignment agreement. Under the current result, if not amended, Mayo now owes royalties for many other Elkin-developed programs, and for time periods after December 2008 even for the one proven assignment. Yet, the District Court has not required of Mayo the accounting Elkin requested for the royalties Mayo received and the share belonging to Elkin. *See* Answer to Amended Complaint, App. 143–177 at A-28, 30.

Appellate Case: 11-2959    Page: 46    Date Filed: 12/30/2011 Entry ID: 3864389

From the beginning, Mayo has acknowledged its obligation to accrue and pay Elkin royalties, albeit subject to a claimed right to withhold litigation expenses. By its December 17, 2008 letter, Mayo acknowledged the sum it had at that point accrued and escrowed subject to the result of this case. App. 6966–6967. The jury's findings were determinative of this claim and also of the parties' contractual obligations going forward. All of the findings should have been reflected in the final Order and judgment.

3. **The District Court erred by entering an overbroad injunction enjoining Dr. Elkin from use of all "parts" of the Mayo-claimed software. The District Court's judgment, final Order and injunction of May 26, 2011, all fails to meet the requirement of Rule 65(d), Fed. R. Civ. P., particularly the specific requirements for reasonable detail and clarity.**

*Roche* also leads us to the first of many examples of the "parts" breadth over issue created by the May 26 Order, namely the issue of the United States government's rights under the terms of the Elkin grants at Mayo, discussed above.

Another example is the required return by Dr. Elkin to Mayo of not just the code for the software as it existed when he resumed his research at Mt. Sinai, but also of any media containing any "part"

40

(however small) of the Mayo-software era. Dr. Elkin complied with the Order by immediately returning all his disks and media to Mayo, Elkin Declaration App. 5732–5733, even though that meant transferring to Mayo the new work done at Mount Sinai and "parts" that had never before been at Mayo. This data included, for example, Dr. Elkin's post-Mayo effort to apply natural language processing to medical records in languages other than English and medical terminologies other than English—something the work at Mayo had never attempted. See Elkin Declaration, App. 5732–5733. Although this "part" of the software, the post- Mayo "tail," was explicitly understood and acknowledged by the District Court to be excluded from the stipulation on which Mayo ownership, the jury instructions, the verdict and findings, and Order were based, all of the Post-Mayo work or "tail" was ordered sent to Mayo, because that is what the District Court's Order said literally, with no guidance on how to sort out the Mayo-era "parts" from the later "tail" parts, as might have been possible if consideration of "parts" had not been excluded from the evidence.

By including "parts" in the orders, but never further defining what parts are unique or proprietary to Mayo, the Order purported to give

41

Mayo rights to subject matters never claimed as proprietary by Mayo nor found to be such by the jury. The parties had stipulated the ownership of certain programs, but only as complete programs and without any reference to the origin or ownership of the many individual parts, commands, data, elements or subroutines out of which programs are necessarily created. To avoid confusion, since all software is necessarily built largely of many "parts," the Order should have either refrained from adding coverage as to "parts" at all or specified what "parts" the District Court found from evidence to have been developed at Mayo and enjoined to Elkin. There were simply too many other "parts" encompassed by the Order without supporting proof.

By post trial motions, Dr. Elkin called to the District Court's attention many other examples of "parts" neither claimed by Mayo nor conceivably subject to Mayo ownership. App. 4485–4494.

The binary code of all computer software users include;

1    computer programming languages used to create the software,

2       standard medical forms and data, such as the "history" and "diagnosis" sections or fields of standard medical records, and patient records, medical language and descriptions,

3       open source software; program routines, sub-routines, and algorithms, as well as known techniques and features, such as scanning, matching, retrieval and organization of date;

4       software not created at Mayo originally or owned by others, for example government-owned software such as the United States government's national medical library listing of medical terminology, or Medicare/Medicaid billing requirements, and software or parts of software to which the United States holds rights;

5       software and parts of software developed by Dr. Elkin before arriving at Mayo and

6       software and parts of software developed by Dr. Elkin and others after leaving Mayo, for example at Mount Sinai.

The District Court's uncritical refusal to change the original Order, meant that the original Order's award of all "parts" to Mayo still without saying what "parts" (less than "any") were intended. This could

43

not reasonably be interpreted to include any of the problematic "parts" above. The plain meaning of "parts" reinforces the problem in that "parts" or "part" means "1 a (I): one of the often indefinite or unequal subdivisions into which something is often regarded as divided and which together constitute the whole." Webster's Ninth Collegiate Dictionary; Merriam-Webster (1980), p.837.

In other words, the very selection of the word "parts" for inclusion in the Order and injunction, without more, added an indefinite or unspecific term, which the District Court declined to further specify.

Further, enjoining Dr. Elkin from using any computer language, and even non-proprietary elements of existing languages and programs not developed at Mayo, for example natural language programming[12], would prevent Dr. Elkin from plying his trade or performing any programming in the future, thereby destroying his livelihood.

---

[12] As a matter appropriate for judicial notice, Appellant notes that the history of "natural language processing," the very concept and term itself, for example as shown in the Wikipedia article on that term, dates to the 1950's and the seminal work of Chomsky. No party to this case claims to have invented "natural language processing." The dispute is simply about significant parts of Elkin's software that now make Chomsky's concept work well with medical records.

Appellate Case: 11-2959   Page: 51   Date Filed: 12/30/2011 Entry ID: 3864389

The Order contravenes Rule 65(d)(1)'s requirements that an injunction must "state its terms specifically...", Fed. R. Civ. P. 65(d)(1)(B), and must "describe in reasonable detail... the acts restrained or required..." Rule 65(d)(1)(c) Fed. R. Civ. P. In the specific context of software, for example, *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583-84 (7th Cir. 2002) held that it is "implausible" to hold that "all information in or about [Plaintiff's] software is a trade secret....[T]he complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets." To see how software and parts should be more clearly treated, compare, *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 1000 (N.D. Cal. 2006) (proposed injunction order which "specifically identifies copyrighted [software] code...and narrowly tailors the protections surrounding that code" was appropriate). In contrast, the instant Order does not contain that required specificity.[13]

---

[13] "Even without objections by a party, a court has an independent duty to assure that an injunction is specific in its terms and describes in reasonable detail the acts sought to be restrained." *See, EFS Marketing, Inc. v Russ Berrie & Co.*, 76 F.3d 487, 493-94 (2nd Cir. 1996); 4 Nimmer on Copyright, § 14.06(C) (2006).

Appellate Case: 11-2959    Page: 52    Date Filed: 12/30/2011 Entry ID: 3864389

In the alternative, particularly if the District Court had recognized that the record below was inadequate to support findings on which "parts" of the disputed programs could legitimately be declared to be Mayo-originated property or trade secrets, Dr. Elkin requested judgment in his favor as a matter of law as to all "parts" for which no proof had been offered, which would be essentially all the "parts."

The one case cited by Mayo below to arbitrarily enjoin use of "parts" referred only to a disputed customer list as the trade secret and the included customer names as the "parts". *Patriot Funding, LLC v. Lefort*, 2006 U.S.Dist. Lexis 40427 (D. Mass. 2007). That case is distinguishable and inapposite, grossly, on its face.

In contrast, in a case from the District of Minnesota itself, *I-System, Inc. v. Softwares, Inc.*, No. 02-1951 (D. MN.; March 29, 2004), the differing rights in certain particular parts of software were proven sufficiently to be included or excluded within an injunction, along with the program as a whole, while others were found not to have been sufficiently established. In other words, the District Court of Minnesota's own precedent shows that "parts" of a program are not necessarily to be included or covered by injunction just because the

46

entire program, considered as a whole, is found to be owned by a party. The many "parts" of a program, their history and provenance, can be distinguished and proven. The title to any such "parts," should be proven if a claim is also made to separate ownership of one or more of those parts as a unit distinct from the program as a whole.

Section 4(b) of the Order forbids the use of "any part" of the software (Order, A-29), and also included all parts of "source code, or any proprietary information contained within them, whether in Mayo Software's original programming language or as translated into another language." But only "parts" proprietary to Mayo, if any, should be covered by the Orders and they should be specifically listed. *See IDX Sys. Corp.*, 285 F.3d at 583.

By using the "any part" language generically, without any further guidance on what constitutes "proprietary information contained within them," Paragraph 4(b) of the Order on its face would prevent Dr. Elkin from using, or in any future employment working with: (1) any computer language, (2) the very binary code of ones and zeros that every computer program uses, (3) compilers that translate those ones and zeros into simple commands or data for a particular computer or

de-compilers doing the reverse, and (4) even elements of higher-level programming, such as the application programs cited in the Court's Order, that are not unique to Mayo but instead are used by other users of the same or similar computer languages. All of these listed items should have been allowed by providing Rule 65(d)(1) specificity to the Order and Judgment.

The May 26 Order would also forbid Dr. Elkin from using or working with (1) open source programs, that is, programming deliberately made available for public use by its creators and owners; (2) other public domain materials, techniques, elements or parts of programs, and even letters of the alphabet and the numbers zero and one; (3) source code, techniques, elements or parts of programs previously published or freely available to the public; (4) standard practices of programming used in health care information health systems and the technology of a whole field of research -- natural language processing,-- among others, in no way owned by Mayo; and (5) methods, programs, techniques and parts of programs developed by Dr. Elkin before joining Mayo. All of these listed items should also have been allowed under the Order or by amendment.

Further, the Order effectively says that Dr. Elkin cannot work even for the Government's own agencies, such as NIH, on software the government itself funded and either owns outright or retains "march in" rights.

Although the record is inadequate for this Court or the District Court to delineate the extent of Mayo's rights in "parts", much less *all* parts, of the multiple programs in dispute, that inadequacy of the record calls for either judgment in Dr. Elkin's favor as Mayo has not proven its case as to such "parts", s*ee IDX Sys. Corp.*, 285 F.3d at 583, or for new evidence to be adduced to address the origin and ownership of whatever parts Mayo decides to claim as its inventions or properties in their own right.

Mayo asserts that the existing Order is "sufficiently specific and detailed." App. 5666-82 at App. 5672. In support Mayo has not to this day cited a single precedent upholding the wholesale inclusion of all "parts" of a program, *i.e.* at every level of size or function from the largest files and modules to the smallest bits of computer language. Dr. Elkin asserts here, as below, the standard re-affirmed in *Clearone Communications v Bowers*, No. 09-4092 (10th Cir. June 27, 2011)

49

(quoting *Garrison v. Baker Hughes Oilfield Operations, Inc.,* 287 F.3d 955, 962 (10th Cir. 2002)). "It is well settled [that] an injunction must be narrowly tailored to remedy the harm shown." *Id.* at 28. The injunction here is not. *See also, Iconix, Inc. v. Tokuda,* 457 F. Supp. 2d 969, 1000 (N.D. Cal. 2006) (proposed injunction language that "could be interpreted to apply to more than just Plaintiff's copyrighted [software]" was not proper).

### 4. The District Court erred in awarding attorneys' fees of $1,900,139.30 to plaintiff Mayo, by the Order of August 24, 2011.

On July 28, 2011, Plaintiff Mayo Clinic ("Mayo") submitted its amended claim for attorneys' fees by the Declaration of its counsel Adam Steinert. App. 5701-17. The declaration fell short of meeting Mayo's burden to establish the reasonableness of the claimed fees. Mayo failed to distinguish between fees for work on the sole Count for which a fee award was permitted, the trade secret Count, and the nine other Counts that Mayo chose to pursue through judgment even though they do not provide for recovery of fees.

Mayo simply lumped the great majority of its counsels' time entries into an abbreviated summary of each monthly bill to Mayo, *see*

App. 5701-17, citing perhaps a major task or two that had been undertaken in any given month, but without disclosing individual time entries, only a short one-liner summary for each month. Neither the District Court nor Elkin ever saw the time entries. Elkin's request for an examination of those charges by his own counsel, or at least by the District Court *in camera*, were denied. A-43 – A-50.

The law on fee awards is well-established. The starting point is the "Lodestar" approach. But to get any attorneys' fees at all, Mayo must first meet its burden of proof on reasonableness of both the rates it seeks and the relationship of those charges to the objective for which an award is made. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (the fee applicant bears the burden to produce evidence to support the rates charged and hours worked); *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (noting that "the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorneys' own affidavits—that the requested rates are in line with those prevailing in the community"). Mayo did not meet that burden.

### a. Mayo did not Prove Reasonability for the Fees Claimed.

Although Mr. Steinert's Declaration asserts his firm's rates and time entries are reasonable, this is on its face no more than an opinion, and hardly an unbiased one, by which Mayo has not satisfied its burden "to produce satisfactory evidence." *Blum,* 465 U.S. at 895 n.11. Success, at trial of course, is an important factor, *Id.*, but the judgment in this case, properly construed, *i.e.* without the adding of all "parts" to the injunction, does nothing more than follow from the parties' stipulation, and also requires payment to Dr. Elkin of his royalty share.

The District Court's fee Order cites the number of Counts decided by the jury in favor of Mayo as "success" by Mayo, but that number resulted from Mayo multiplying its ownership claim into eight separate Counts for every legal theory that might sanction conduct inconsistent with such ownership, while the District Court compressed Elkin's own multiple breach counts into a single (successful) verdict director. In the verdicts, each side simply had "success" in their one core contention, again aside from the "parts" issue: ownership on Mayo's side and payment of royalties on Elkin's.

By providing only a short summary for each month, Mayo deprived both the District Court and Dr. Elkin of any real opportunity to examine time entries to consider, for example, whether tasks were overstaffed, duplicative, pursued efficiently, or accomplished expeditiously. Even acknowledging that this case involved almost a week of trial, and also depositions and motion practice, the multi-million dollar total of Plaintiffs' fees appear unreasonable on its face. *See Hensley*, 461 U.S. at 433-34. ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Ford Motor Co. v. B & H Supply, Inc.*, 1987 U.S. Dist. LEXIS 14939, at *12-13 (D. Minn. Apr. 13, 1987) (significantly reducing fee award in part because entries were duplicative). *See also, Transclean Corp. v. Bridgewood Servs., Inc.*, 134 F. Supp. 2d 1049, 1052 (D. Minn. 2001) ("Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary...").

### b. Mayo Failed to Establish that it's Claimed Entries Were as to the Portion of its Fees Reasonably Allocable to the Trade Secret Count.

Case law in the District of Minnesota provided the District Court precedent for appropriate allocation of attorneys' fees in cases of fees claimed for tasks that applied equally to multiple Counts and objectives.[14] *See, e.g., Ford Motor Co.,* 1987 U.S. Dist. LEXIS 14939, at *12 (awarding fees only for copyright and trademark infringement claims, the Court stated "[u]nder the Copyright Act and the Lanham Act, courts may properly award attorneys' fees only for those services attributable to the copyright and/or trademark issues") (citing M. Nimmer, 3 Nimmer on Copyright § 14.10[B]); *The Warehouse Restaurant, Inc. v. The Customs House Restaurant, Inc.,* 219 U.S.P.Q. 1221, 1223-24 (N.D. Cal. 1982). Appellant urges that this particular aspect of a fee award, the proper allocation of the fees, is also subject to the "reasonableness" standard, a test applicable to the fees overall.

---

[14] Appellant's research has found no Eighth Circuit precedent on allocating claimed attorneys' fees among multiple Counts when only one Count of many permits a fee award. The issue is, therefore, submitted as one of first impressions in this Circuit.

54

## CONCLUSION

The judgment and final Order of the District Court should be set aside and the cause remanded with directions to enter an Order and Judgment: (1) declaring Dr. Elkin's inventorship and rights of ownership, not just Mayo's, in "any parts" of the programs not assigned to Mayo after allowing Elkin to prove the source and ownership of the programs' key parts, (2) eliminating any injunction references to "parts" of programs and limiting any restraint to the stipulated software as complete wholes, (3) incorporating the jury's findings as to the contents of Elkin's assignments and employment agreements, and requiring Mayo to pay Dr. Elkin 40% of its revenues from software for which he is an inventor, less any co-inventor shares which may appear in a written assignment for a particular program, without withholding or offsetting any litigation fees or expenses, and (4) requiring Mayo to fully account to Elkin for all royalties, Mayo's and his, as received by Mayo on his inventions.

Appellate Case: 11-2959    Page: 62    Date Filed: 12/30/2011 Entry ID: 3864389

Finally, the District Courts' award of attorneys' fees should be reversed outright and Mayo directed to pay all royalties due Elkin for his inventor's share, forthwith.

Appellate Case: 11-2959     Page: 63     Date Filed: 12/30/2011 Entry ID: 3864389

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)

The undersigned counsel for appellant, Dr, Peter L. Elkin, M.D., hereby certifies that the foregoing Brief of Appellant complies with the typed volume limitation under FRAP 32(a)(7)(b), in that it uses a 14 point proportionately spaced typeface and, according to the Microsoft Word 2007 word processing software used to create the document, it contains 11,845 words, excluding those sections referenced in FRAP 32(a)(7)(B)(iii). In accordance with 8th Cir. Rule 28A(d), appellant file herewith a CD-ROM containing the full text of the Brief of appellant with the file name "Brief of Appellant" in both PDF format. The undersigned certifies that the CD-ROM has been scanned for viruses and is virus free.

David J. Massa Bar No. 30119
101 S. Hanley, Suite 1700
St. Louis, MO 63105
Telephone (314) 615-6046
Fax (314) 615-6001
Kenneth.solomon@galloplaw.com
David.massa@galloplaw.com

**ATTORNEYS FOR DEFENDANT**

57

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of December, 2011, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Adam R. Steinert
Jonathan E. Singer
John C. Adkisson
Michael Eugene Florey
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
steinert@fr.com
singer@fr.com
adkisson@fr.com
florey@fr.com

B. Trent Webb
Lynn C. Herndon
Megan J. Redmond
Beth A. Larigan
Daniel P. Devers
Shook, Hardy & Bacon L.L.P
2555 Grand Boulevard
Kansas city, Missouri 64108
bwebb@shb.com
lherndon@shb.com
mredmond@shb.com
blarigan@shb.com
ddevers@shb.com


/s/ David J. Massa

58

# ADDENDUM

1. Order of December 27, 2010, and evidentiary ruling

2. Order and Judgment of May 26, 2011 and May 27, 2011

3. Order denying Post Trial Motions, August 9, 2011

4. Order Awarding Attorneys' Fees, August 24, 2011

5. Transcript excerpt from Exhibit A of Declaration of Adam Steinert dated July 20, 2011

6. Assignment of HCML Toolkit Software-February 2002

7. Selected Jury Instructions

Appellate Case: 11-2959    Page: 66    Date Filed: 12/30/2011 Entry ID: 3864389